IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| MELVIN L. COX, | ) | |
| | ) | |
| Petitioner, | ) | Case No. CV 04-0324-S-BLW |
| | ) | |
| v. | ) | **FINDINGS OF FACT,** |
| | ) | **CONCLUSIONS OF LAW,** |
| DAVE PASKETT, Warden, | ) | **MEMORANDUM DECISION** |
| | ) | **AND ORDER** |
| Respondent. | ) | |
| _____ | ) | |

On November 27, 2007, the Court held an evidentiary hearing on the remaining claims in Petitioner Melvin Cox's ("Petitioner") Second Amended Petition for Writ of Habeas Corpus.  Petitioner was represented by Charles F. Peterson, Jr., and Respondent Dave Paskett ("Respondent") was represented by L. LaMont Anderson.  The transcript has been prepared (Docket No. 94), and the parties have submitted their post-hearing briefing (Docket Nos. 91 & 101).  Accordingly, having reviewed the record in this case, including the transcript of the evidentiary hearing, the state court record, and the exhibits submitted by the parties, and having considered the arguments of the parties, the Court enters the following Order denying habeas corpus relief.

**BACKGROUND**

Petitioner alleges that his indeterminate life sentence was intended to be no longer than thirty years, and that he is now illegally incarcerated by the State of Idaho, having served over thirty-seven years on his sentence.  Petitioner filed a pro se Petition for Writ

of Habeas Corpus in June 2004, and later filed an Amended Petition.  (Docket Nos. 1 &

9.)  After Respondent filed a Motion to Dismiss, the Court appointed counsel, who filed a

Second Amended Petition containing four claims on behalf of Petitioner.  (Docket No.

30).

 The Court conditionally granted Respondent's Motion for Summary Dismissal as

to the statute of limitations issue on Claims 2 and 3, the procedural default of Claims 2, 3,

and the Eighth Amendment issue presented in Claims 1 and 4.  (Docket Nos. 37 & 48.)

The Court allowed Petitioner to proceed to the merits of Claim 1, a Fourteenth

Amendment Due Process Clause liberty interest issue, and Claim 4, an Ex Post Facto

Clause release and parole issue.  The Court permitted counsel to conduct discovery on the

remaining claims and held an evidentiary hearing on November 27, 2007.  (Docket No.

87.)

## FINDINGS OF FACT

 Based upon the state court record and the evidence presented at the evidentiary

hearing, the Court makes the following findings of fact.

1.  On May 4, 1971, the State of Idaho filed a criminal complaint charging

  Petitioner and co-defendant Jessie L. Jones with the June 15, 1970 first-

  degree murder of Ralph Russell, a Lewiston City Police Officer.  (State's

  Lodging A-2, p. 4; State's Lodging D-8.)  At the time of his arrest,

  Petitioner had been convicted of and sentenced for bank robbery in federal

court and was serving two consecutive 20-year sentences. (Evidentiary

Hearing Transcript 38:7-25; 39:1 ("Tr.") (Docket No. 94).

2.    On May 4, 1971, Petitioner first appeared in court. (State's Lodging A-2, p.

7.) He requested appointment of counsel, and attorney Paul Keeton was

appointed to represent him the same day. (*Id.*, pp. 6-7.) Keeton appeared

in court as counsel for Petitioner later that afternoon. (*Id.*, p. 7.) Jones also

appeared in court on May 4, 1971, represented by attorney Owen Knowlton.

(State's Lodgings D-10 & D-11.)

3.    On May 5, 1971, Jones' preliminary hearing was held, after which the

magistrate judge reserved decision until the conclusion of Petitioner's

preliminary hearing. (State's Lodging D-11.)

4.    On May 14, 1971, Petitioner, represented by Mr. Keeton, had his

preliminary hearing. The magistrate judge found probable cause, and both

Petitioner and Jones were bound over for trial. (State's Lodging D-23, pp.

104-05.)

5.    Also on May 14, 1971, the prosecutor filed an information charging

Petitioner and Jones with first degree murder. Both Defendants were

arraigned before the Honorable John H. Maynard, each represented by the

same respective counsel who had previously appeared, and each defendant

sought and was granted a continuance before entry of plea. (State's

Lodging D-24.)

6.      On May 24, 1971, Petitioner appeared with Mr. Keeton and asked for appointment of a new attorney.  (State's Lodging E-1, p. 3.)  Lewiston attorney Jerry Smith was appointed as Petitioner's defense attorney, and Petitioner entered a plea of not guilty through Mr. Smith later that same day.  (State's Lodging E-1, pp. 3-4.)  Mr. Smith served as Petitioner's attorney through the negotiations of a plea bargain agreement, the subsequent change of plea, and sentencing.  (Exhibit 111 & 123.)

7.      Roy Mosman was the prosecutor who worked on Petitioner's case.  (Tr. pp. 40:24-25; 41:1.)  Mr. Mosman is now deceased.

8.      Mr. Smith first met with Petitioner in the Nez Perce County Jail.  (Exhibit 111, p. 9:22-24; Exhibit 123, p. 10:6-10.)  At first, Petitioner made Mr. Smith "nervous" because Petitioner "seemed like he could be a danger to [Smith]."  (Exhibit 111, p. 9:5-19).  Later, Smith became "very comfortable" with Petitioner.  (Exhibit 123, p. 12:7-14.)  Smith decided to tape record his meetings with Petitioner because Smith "needed to be very cautious and careful with this . . . man."  (Exhibit 111, p. 45:12-17.)  Petitioner gave his permission for the tape recordings to be made.  (Tr. p. 42:7-11.)  Petitioner was transferred to Spokane after the first meeting with Mr. Smith; thereafter, Mr. Smith visited Petitioner in Spokane and spoke to Petitioner through a glass partition.  (Exhibit 123, pp. 11:19-22 & 12:12-14.)

9.      Petitioner was disruptive during early court proceedings.  (State's Lodging

D-4, pp. 5-6; Tr. pp. 87:4-25; 88:1; Exhibit 118, pp. 29-30.)  During a

hearing with Judge Maynard, Petitioner was told by a deputy sheriff to

"knock it off" after Petitioner "flip[ped] the bird" at Mr. Mosman (Exhibit

111, p. 13:9-21; Exhibit 123, pp. 18:5-25; 19:1-5.)  This incident was later

discussed in one of Petitioner's conversations with Mr. Smith.  (Exhibit

118, pp. 22-23.)  After Cox's disruption, the courtroom was rearranged, and

Cox was placed in a cell adjacent to the courtroom where he could hear

what was taking place.  (Exhibit 111, pp. 13:9-25; 14:1-9.)

10.     Because of Petitioner's disruptions and attitude toward Judge Maynard, Mr.

Smith felt there was "no room for [him] to negotiate anything with Judge

Maynard" even though Mr. Smith considered Judge Maynard a "good

friend[]."  (Exhibit 123, pp. 16:16-25; 17:1-12.)  Mr. Smith conveyed his

concerns to Petitioner, and they agreed to seek Judge Maynard's

disqualification as a matter of right.  (*Id*.; Tr., p. 41:8-13.)  After Judge

Maynard was disqualified, the Honorable Tom Felton from Moscow was

appointed to hear Petitioner's case (Tr. p. 41:8-13; Exhibit 101; Exhibit

123, p. 17:9-10).  Judge Felton is now deceased, as is his court reporter,

Bob Everson.

11.     On June 16, 1971, at approximately 10:45 a.m., the Honorable Judge Daniel

A. Quinlan heard argument on Petitioner's application for writ of habeas

corpus, which was denied.  (Exhibit 101.)  Court recessed at approximately

11:30 a.m. (*Id*.)  When the parties returned at approximately 3:30 p.m.,

Petitioner stated his desire to change his plea to guilty (*Id*.), "provided the

sentence be for no more than life," as reflected in the court minutes

(Exhibit 107).  Present at the hearing were Petitioner, Mr. Smith, Prosecutor

Mosman, Judge Felton, Judge Felton's clerk and court reporter, C.D. Smith

( who was a fellow officer and "very good personal friend" of the victim

Ralph Russell), and a few other people.  (Exhibit 123, p. 24:9-12; Exhibit

113, pp. 5 & 8.)   On that date, Petitioner pled guilty to and was convicted

of first degree murder of a peace officer in violation of Idaho Code § 18-

4003.  (State's Lodgings A-1; A-2, pp. 107-08 & 113-14; A-4.)

12.     Prior to the guilty plea, Petitioner and Mr. Smith had various attorney-

client-privileged conversations that were audio-recorded by Mr. Smith at

the Spokane jail.  The pre-June 12, 1971 conversations include the

following topics related to sentencing:

(a)     Mr. Smith suggested that he talk to Mr. Mosman, the prosecutor,
about the possibility of life in prison, and Petitioner thought it
"couldn't hurt."  (Exhibit 115, p. 4.); Petitioner further stated that for
"[a] life sentence [in Idaho], you come up with over 10 years. . . .
[inaudible] give me life with my 40. [laughs] [inaudible] I'd be a
damn fool not to take it."  (Exhibit 115, p. 6.)

(b)     Mr. Smith relayed to Petitioner that he had asked Mr. Mosman about
plea bargaining, perhaps having the sentence reduced to second
degree murder, and Mr. Mosman had said no.  (Exhibit 115, p. 8.)

(c)     Mr. Smith relayed to Petitioner that he had spoken to Mr. Mosman again about a life sentence: "He hasn't said he would go for that, but he hasn't said he wouldn't, either."  When Mr. Smith asked Petitioner whether he would offer to plead guilty for a life sentence, Petitioner said: "I don't know.  I've been thinking about it.  I don't think I will.  'Cause I believe I'd rather have death rather than to stay in prison for the rest of my life."  (Exhibit 115, p. 38.)  Petitioner indicated that he was "still open" to the idea of a life sentence and had plenty of time to think over his decision.  (*Id*., p. 39.)

(d)     Both Mr. Smith and Petitioner agreed that if the co-Defendant, Jesse Jones, turned state's evidence for a reduced charge and testified against Petitioner, Petitioner would be convicted at trial.  (Exhibit 115, p. 40.)

(e)     Petitioner stated: "[I]f there's any way we can get a hung jury I would like to go through with it, but then after we discussed it and [inaudible] really have [inaudible] hundred percent case, I mean I'd be a fool not to take a life sentence if we could get it.  But I don't want to take life uh if I stand any type of chance. . . .  (Exhibit 116, p. 3.)

(f)     Petitioner further stated: "But you know in the long run if a man, course I'd say [inaudible] but in the long run if a man's going to die in prison [inaudible] never going to get out [inaudible] but if a man's never going to get out, hell really he'd be a fool not to go ahead and let them kill him.  Course a man don't want to die, but shit, rather than staying [inaudible] 40 or 50 years and then dying in there, you know . . . hey, you get it over with quick [inaudible] in the long run.  Maybe, you know."  (Exhibit 116, p. 28-29.)

13.     On or after June 12, 1971 (Exhibit 116, p. 29), the topics of conversation between Mr. Smith and Petitioner included the following:

(a)     Petitioner always knew he would be convicted (117, p. 11), but had remaining questions about whether he would get the death penalty. (Exhibit 117, p. 11).

(b)      Petitioner began to consider offering to plead guilty to a life sentence, but changed his mind because he was surprised at what a good job his attorney was doing (Exhibit 117, p. 3).

(c)      Mr. Smith relayed to Petitioner that Mr. Mosman did not try to plea bargain with Mr. Smith; Mr. Mosman said he didn't care and was just going to try the case.  (Exhibit 117, p. 25.)

(d)      Later, Petitioner agreed that he had few defenses and that he would likely be convicted if he proceeded to trial.  (Exhibit 117, pp. 30-31; Exhibit 118, p. 12.)

(e)      Petitioner entertained the idea that he would maybe plead guilty if his life sentence would run concurrently with his forty-year federal sentence, stating that he "never dreamed" he could get a deal like that with his former attorney, Paul Keeton.  (Exhibit 118, p. 19.)

(f)      Petitioner thought that twenty years would be about the minimum time he would have to serve if he obtained a life sentence that would run concurrently with his federal sentences. It seems that he calculated this as ten years for the federal minimum and ten years for the Idaho sentence.  (Exhibit 118, p. 24.)  He thought that a plea agreement "might be best 'cause . . they've got a lot of damn proof and [inaudible] (Exhibit 118, p. 25).

(g)      Near the end of the conversations, Mr. Smith states that he was going to Portland to interview witnesses about Petitioner's alleged crimes there.  (Exhibit 118, p. 28.)

14.     Petitioner alleges that he, Mr. Smith, and Mr. Mosman met at the Spokane jail on June 14 or 15, 1971, to discuss a plea agreement, and that Mr. Mosman explained to Petitioner and Mr. Smith that a life sentence was going to be only thirty years.  The Court finds that there is insufficient evidence in the record to support Petitioner's assertion of such a meeting and insufficient evidence to support Petitioner's assertion that Mr. Mosman

told Petitioner he would be incarcerated for a maximum of thirty years if given a life sentence.  Further, there is no evidence in the record showing that Mr. Mosman had any interest or motive in "selling" a plea agreement to Petitioner in this solid death penalty case.

15.   Mr. Smith's records do not show there was such a meeting on June 14 or 15.  Rather, his billing records show that Mr. Smith went to Spokane on June 12, 1971, made a long-distance call to Spokane on June 14 costing $.77, and flew to Portland on June 15.  (State's lodging A-2, pp. 117-18.) Mr. Smith did not bill mileage for a trip to Spokane on June 14 or 15, but billed mileage there only for June 5 and 12.  (*Id.*, pp. 116-17.)

16.   Mr. Smith testified that he did not remember entering into a plea bargain agreement with Mr. Mosman.  Mr. Smith remembers having *ex parte* discussions with Judge Felton about giving Petitioner a life sentence rather than the death penalty if Petitioner pled guilty.  Judge Felton finally told Mr. Smith that he would impose a sentence of life in prison. (Exhibit 111, pp. 15:17-25; 16:1-18.)   Later in his deposition Mr. Smith similarly testified that he assumed that Mr. Mosman knew that Mr. Smith had made a deal with the judge for a life sentence.  (Exhibit 111, p. 27:6-18.)

17.   On June 16, 1971, the same day Petitioner pled guilty, Mr. Smith presented Petitioner with a letter specifically addressing Petitioner's concern as to whether a life sentence would run concurrently with his federal sentences.

(Exhibit 106; Tr. p. 67:16-19.)  The letter stated, "I hope this will serve to aid you in your decision."  (Exhibit 106.)  The letter did not mention a meeting with Mr. Mosman, and its timing indicates that a plea agreement had not been reached as of June 16, 1971.  The letter mentioned "a sentence not exceeding life imprisonment," but made no reference to thirty years. (*Id.*)

18.     Petitioner admits that he would not have pled guilty if the federal sentence and the state sentence would not have been concurrent.  (Tr., p. 68:11-17.)

19.     Nothing in the record mentions "thirty years."  Nothing corroborates Petitioner's allegation that representations to him that a life sentence was a maximum of thirty years were the underlying reason for pleading guilty. The only mention of thirty years is from a newspaper article written two days after conviction, June 18, 1971, where Mr. Mosman, the prosecutor, was quoted as citing Petitioner's extensive criminal record and then concluding: "A record like this convinces me that Cox won't be rehabilitated in prison.  He can reasonably be expected to live another thirty years, and even if he spends all that time, some guard will be laying his life on the line every day of that thirty years."  (Exhibit 113, p. 27; Exhibit 5, internal Exhibit E.)   The Court finds that this quotation does not support Petitioner's assertion that anyone told him that a life sentence is a *maximum*

of thirty years; rather, it supports only the general notion that after sentencing, a convict is expected to live approximately thirty years.

20. The Court finds that Petitioner's primary concerns in pleading guilty were that his sentence run concurrent with the prior federal robbery sentences and that he would have an opportunity for parole.  This finding is based on the recorded conversations between Petitioner and Mr. Smith; Mr. Smith's letter of June 16, 1971; and the Court minutes.

21. There is insufficient evidence to show that Judge Felton "came off the bench," approached the defense table, or orally pronounced a thirty-year sentence for Petitioner; rather, there is sufficient evidence to show that Judge Felton pronounced a sentence of indeterminate life for Petitioner, based on the following.

22. The Court finds that Petitioner's earlier concrete assertion that Judge Felton "comes down off the bench, comes to the defense table and takes paper, " (Docket No. 14, p. 8) is rendered less credible because of Petitioner's wavering testimony at the hearing: "And then in the middle he came off the bench.  I *actually thought* he was standing at the podium right where you was at, and he *came -- well, he agreed* -- he agreed with me."  (Tr. p. 48:5-8 (emphasis added.))

23. Mr. Smith does not recall Judge Felton coming off the bench, and approaching the defense table, and believes he would have recalled such an

unusual event if it had happened.  (Exhibit 123, pp. 51:6-15; 59:4-13.)  Mr. Smith remembers Judge Felton told Petitioner he would receive life in prison.  (Exhibit 123, pp. 50: 15-25; 51:1-5.)  Mr. Smith recalls that Judge Felton did not mention the death penalty, nor did he mention thirty years. (Exhibit 111, p. 28:12-25; Exhibit 123, pp. 59:17-25; 60:1-2.)

24.     C.D. Smith, a spectator in the courtroom, does not mention the judge coming off the bench to cross off wording at the defense table.  (Exhibit 113, pp. 11-16.)  C.D. Smith testified that the prosecutor did not make a sentencing recommendation "because . . . that was pretty much done by Tom Felton." (Exhibit 113, p. 12:3-10.)   He testified that Judge Felton orally pronounced a life sentence.  (Exhibit 113, p.11:10-12)  He testified that Petitioner did not respond to the pronouncement, and there was no discussion of his sentence being the equivalent of thirty years.  (Exhibit 113, p. 16:2-13.)  C.D. Smith testified that he thought Judge Felton explained that the life sentence would be without parole.  (*Id.*)

25.     A newspaper article from the Lewiston Morning Tribune gave a detailed report of the hearing, including chronological quotations from Petitioner and Judge Felton.  The report reads: "'I will sentence you to life imprisonment,' Judge Felton said."  It makes no mention of a discussion of thirty years or of the judge coming off the bench, but reported, "Cox's sentence began yesterday at 3:42 p.m. when Judge Felton signed the

judgment.  It will run concurrently with two federal sentences of 20 years each which Cox received in Tennessee for armed robbery."  (Exhibit 101.)

26.    The court minutes indicate that the sentence pronounced was "the maximum indeterminate term of life. . . to commence from June 16, 1971." (Exhibit 107.)

27.    Smith recalled that he "told [Petitioner] it would be a life sentence, period. That's what I was bargaining for, and that's what I thought I got."  (Exhibit 111, pp. 19:22-25; 20:1.)  When asked if he ever had any discussions with Petitioner that a life sentence was only thirty years, Mr. Smith testified: "Never, never heard of that one, not at that time."  (Exhibit 123, pp. 25:22-25; 26:1-2.)  When asked if he could recall any time during his representation of Petitioner "of hearing that a life sentence in his case would be thirty years," Smith replied, "No," (Exhibit 123, p. 26:7-9), and stated, "there was nothing said to that effect" (Exhibit 123, pp. 59:22-25;60:1).

28.    Petitioner admits that Mr. Smith did not tell him that a life sentence was the equivalent of thirty years.  (Tr., p. 81:19-25; 81:8-16.)

29.    Petitioner alleges that Mr. Smith told him that his maximum sentence was going to be ten years if he pled guilty in return for a life sentence.  (Tr., p. 80:13-18.)

30.    There is insufficient evidence in the record to show that Mr. Smith told Petitioner that a life sentence was a maximum of ten years.  The only

mention of ten years in the record is Petitioner musing that a guilty plea would mean he would spend a minimum of twenty years, ten of which would be on the Idaho sentence-- "I was thinking about a [inaudible] sentence then you know, consecutively.  I said hell, I'll never get around to doing [inaudible] uh if I did, time I got out of federal, why shit, 10 years, that was a life sentence in uh Idaho. [inaudible] 20 years'd be about the minimum."  (Exhibit 118, p. 24.)   He further mused, "I'm just thinking about it 'cause 20 years now, hell, I won't be too fucking old."  (*Id*.)  While this  statement alone is unclear as to whether he meant ten years *minimum* or ten years *maximum* on the Idaho sentence, he later contradicted his assertion at the hearing by testifying that Mr. Smith emphasized the "life" nature of the sentence, not that it would be a maximum of ten years:

> Q.    Now, Mr. Smith had had some level of difficulty convincing you to plead guilty for this maximum ten-year sentence; correct?

> A.    Well, he had the difficulty -- no.  He had the difficulty when he kept saying life, life, life, because he kept saying life sentence, life sentence, and I said, "Absolutely not.  I won't do it."

(Tr., p. 81:1-7.)   The Court also finds that the untenable assertion that Mr. Smith told Petitioner that a life sentence for first degree murder was a maximum of ten years bears negatively on Petitioner's overall credibility.

31.    Four different versions of the Judgment of Conviction have been produced by the parties.  The first version has a handwritten case number, shows that

"July" has been crossed out and "June" has been written over the crossed-out word in cursive writing; that the following term has been crossed out: "for the maximum indeterminate term of ~~the rest of his natural~~ life"; that the time is noted to be 3:22; that an actual signature, "Tom Felton," appears on the signature line of the judgment; and that a file stamp is affixed.  (Exhibit 102.)  The second version has a handwritten case number; shows that "July" has been crossed out and "June" has been written over the crossed-out word in cursive writing; the term "the rest of his natural" is not crossed out; the time is noted to be 3:22 p.m.; a typewritten signature, "Tom Felton," is affixed on the signature line of the judgment; and it bears a file stamp.  This version bears a Clerk of Court certification that it is a true and correct copy of the original, signed by Mary Kelley, dated June 16, 1971.  (Exhibit 103).  The third version does not have a case number, file stamp, or certification; the time is noted to be 3:42; the "rest of his natural" phrase is crossed out; "July" is crossed out and June written in over it; and a typewritten signature, "Tom Felton," is on the signature line.  (Exhibit No. 104.)  The fourth version has no file stamp, no case number, no certification,  no time, no lined-out phrase or month, and a typewritten signature "Tom Felton." (Exhibit 105; State's Lodging A-1.)  All versions were prepared by Mr. Mosman, whose name and address appears at the top of each.

32.     The state court's original paper files in this case were destroyed in a fire in
March 1994.  (Exhibit 125, p. 13.)  Mr. Smith's paper files on this case
were destroyed in a flood.  (Exhibit 123, p. 43).  Court staff recreated the
original court file by copying microfilm cards (Exhibit 114, p. 7 & Exhibit
114, internal Exhibit 1.)   Two judgments appear in the reconstructed court
file that mirror Exhibits 102 & 103 (Exhibit 114, p. 10:12-17; see Exhibits
102 & 103.).  In addition, the reconstructed court file also contains five
copies of another version of the judgment that mirror Exhibit 105. (Exhibit
114, pp. 17:5-24; 18:1-25.)

33.     Shelly Roe, an employee of the Nez Perce County District Court Clerk's
office since 1984, was one of the court staff who reconstructed the record
from microfilm.  (Exhibit 114, p. 13:11-19.)  She opined that the executed
copy of the judgment of conviction with the handwritten signature was the
original (matches Exhibit 102), that the other executed copy with the typed
signature was a copy of the original (matches Exhibit 103), and that the five
unexecuted copies (matches Exhibit 105) were simply extra copies of the
judgment that had been submitted by the prosecutor but not used.  (Exhibit
114, pp. 17:5-25; 18:1-25)

34.     On October 3, 2007, the Idaho Department of Correction provided
Petitioner with a copy of the judgment of conviction it had on file.  That

copy matches Exhibit 102 (with the crossed-out phrase and the handwritten signature).  (Exhibit 3.)

35.    On October 15, 2007, the Federal Bureau of Prisons provided Petitioner with a copy of the judgment of conviction from its file; that copy also matches Exhibit 102.  (Exhibit 4.)

36.    The evidence supports the finding that Judge Felton crossed out the extra words and fixed the month on the written judgment prepared by the prosecutor, but made the revisions on the bench or after the hearing, such that Mr. Smith, C.D. Smith, and newspaper reporter did not notice.  As noted above, there is insufficient evidence to show that Judge Felton did so with an oral explanation that Petitioner's maximum sentence was thirty years.  The official judgment of conviction--according to the current Nez Perce County Clerk of Court, the Idaho Department of Correction, and the Federal Bureau of Prisons--is the version found at Exhibit 102, which has the handwritten signature and the crossed-out phrase.

37.    There is insufficient evidence in the record to show that Judge Felton intended that Petitioner necessarily be released on parole.  Rather, the evidence shows that Petitioner would be eligible for parole during his life sentence.

38.     Petitioner was placed in custody of the State of Idaho in 1979 after his
        federal incarceration; he was paroled from his federal armed robbery
        convictions in 1983.  (Tr., pp. 62:1-5; 65:18-25; 66:1-9.)

39.     At the time Petitioner was sentenced, the view was commonly held at the
        prison and among those who worked with parole hearings that a life
        sentence was considered thirty years for the purpose of calculating parole (a
        prisoner would be eligible after serving ten years, which was an
        approximation of one-third of a life sentence).  (Tr., pp. 14:4-14; Tr:17:15-
        25 & 18:1-2).  Although most inmates with an indeterminate life sentence
        were released on parole, some were not.  (Tr., p. 15:1-7.)  Importantly, there
        is no evidence in the record that any inmate with a life sentence was ever
        released outright after thirty years, having fulfilled his sentence.  (Tr., p.
        34:16-19.)

40.     Mr. Smith had his deposition taken in this matter on June 15, 2006, and
        again by videotape on November 26, 2007, in lieu of testifying at the
        hearing.  At the time of his first deposition, Mr. Smith described himself as
        having "pretty good recall."  He was 82 at the time of the first deposition
        (born May 3, 1924), exercised daily, and consider himself in "pretty good
        shape."  (Exhibit 111, p. 43:4-9.)

41.     Dr. Bozarth, Mr. Smith's treating physician, opined that Mr. Smith has
        "dementia that will slowly progress or is slowly progressing." (Exhibit 1, p.

20:13-18.)  As far as describing Mr. Smith's long-term memory, Dr.

Bozarth testified: "I can't say exactly, but what I would expect is there

would be the likelihood of some inaccuracy in recalling events.  Without

another verifiable source to back up what he is saying, I would think that he

may exhibit some of the same difficulty with remembering past details that

he now exhibits on current material.  And it isn't a black and white issue,

but I don't think he would know if he were remembering it inaccurately."

(*Id.*, pp. 2219-25; 23:1-6.)  Dr. Bozarth further testified, "[G]enerally,

people remember older memories better than recent memories, but it's, it's

a continuum."  (*Id.*, p. 23:19-21.)  In addition, he testified, "People just

become generally less capable of organizing and remembering with

accuracy, and that tends to be more heavily weighted to recent events, but it

also spills over into older events."  (*Id.*, p. 26:4-7.)

42.     The Court finds that Dr. Bozarth's testimony is reasonably accurate with

regard to Mr. Smith's recall ability at his depositions.  For example, Mr.

Smith could not recall the reasons he was taking his current medications,

but the portions of his testimony relied upon herein are consistent with other

contemporaneous sources in the record. (Exhibit 123, p. 46:2-22.)

43.     Petitioner was first eligible for parole on June 16, 1981.  (State's Exhibit

130.)  He alleges that he was given an early hearing in about June 1979; an

*in absentia* hearing in January 1980; then another hearing in January 1985

or 1986; and another in January 1990.  (Exhibit 109; State's Lodging B-1, p. 24.)  Parole was denied each time.  (Tr. p. 54:1-6.)

44.  Petitioner wrote to an attorney in 1994, "due to a controversy among prisoners concerning the (30) years life sentence."  (State's Exhibit B-1, p. 4.)  In addition, on August 9, 1994, pursuant to his request, Petitioner received a time computation sheet from the Idaho State Correctional Institution that showed that his sentence was "not to exceed life," and that had no date written in the space marked "full term expiration date."  (State's Lodging B-1, pp. 22-23.)

45.  Petitioner alleges that at his fifth parole hearing on January 4, 2000, he questioned the board about whether he would be paroled or released outright in thirty years.  He alleges that the parole board told him that he would never be released.  (Exhibit No. 109, pp. 4-5.)

46.  On January 27, 2000, Petitioner wrote a letter to Olivia Craven, Executive Director of the Commission, in which he inquired whether his full-term release date meant thirty years from his conviction or upon death. (State's Lodging B-1, pp. 35-36.)  On February 22, 2000, the Parole Commission sent Petitioner a clarifying letter in response to a letter from Petitioner.  The Commission letter states that Petitioner had been passed to his "full term release date," meaning that he was "to stay in prison for the remainder of [his] life." (State's Lodging B-1, p. 37.)  This same letter instructed

Petitioner to use the Self-Initiated Progress Report (SIPR) process to appeal the decision if he wished to do so.  (*Id.*)

47.     In practice, inmates with indeterminate life sentences may petition the Commission asking for another parole hearing even if they have been denied parole and told they must serve the remainder of their sentences. (Tr., p. 16:9-17.)

48.     On March 13, 2000, Petitioner filed a writ of habeas corpus in the state court system, alleging that his sentence was to be completed on June 16, 2001.  His claims were rejected by the lower state courts.  (State's Lodging B-1, pp 5-188.)

49.     Because of various procedural rulings by the Idaho Supreme Court, the merits of Petitioner's appeal were never addressed by that court.  (State's Exhibit C-1 through C-20.)

## STATEMENT OF THE LAW

**A.      Sentencing and Parole Laws in Place on the Date of Petitioner's Conviction**

Beginning July 1, 1970, Idaho adopted a system of indeterminate criminal sentencing laws, which abolished minimum periods of imprisonment for felonies.  *See* Idaho Code § 19-2513 (1970).  Under the new system, state district judges were required to sentence convicted felons to the custody of the Idaho Board of Correction for:

> an indeterminate period of time, but stating and fixing in such judgment and sentence a maximum term of imprisonment, which term shall be for a period of not less than two years nor exceeding that provided by law

therefore, and judgment and sentence shall be given accordingly, and such sentence shall be known as an indeterminate sentence.

*Id.*

At the time of Petitioner's sentence in 1971, only two possible sentences were permitted for a conviction of first-degree murder: death, or "punishment by imprisonment in the state prison for life."  Idaho Code § 18-4004 (1970).  Idaho Code § 20-223, governing parole, was also amended effective July 1, 1970.  That section gave the Idaho State Board of Correction the authority to establish rules and regulations governing when a felon could be paroled, "provided, however, that no person serving a life sentence in the state penitentiary shall be eligible for release on parole until he has served at least ten years."  I.C. § 20-223.

**B.      Habeas Corpus Standard for Relief**

On federal habeas corpus review, the federal court analyzes the last reasoned state court judgment.  *Ylst v. Nunnemaker*, 501 U.S. 797, 805 (1991).  In cases filed after April 24, 1996, the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA) applies. The standard of law to be applied under AEDPA is determined by the depth of treatment the claim was given in state court.

Where a state court *adjudicated a claim on the merits*, habeas corpus relief is available if petitioner can show that the state court's decision:

> 1.      resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

2.      resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)&(2).

Where, as here, a habeas corpus petitioner challenges the facts underlying his claim,  the court performs an "intrinsic review" of the facts in the state court record. *Taylor v. Maddox*, 366 F.3d 992, 999 (9th Cir. 2004). If the factual findings are "unsupported by sufficient evidence," the factfinding "process employed by the state court is defective," or "no finding was made by the state court at all, " the Court then performs an "extrinsic review."  In such case, the state court's facts are not presumed correct and new evidence brought in federal court need not meet the clear and convincing evidence standard.  *Id.*.; *see* 28 U.S.C. § 2254(e)(1).  Rather, the petitioner must prove any new facts by a preponderance of the evidence.  *Id.* at 1013 n. 16.

If the state court factfinding is deemed unreasonable under § 2254(d)(2), the petitioner may be granted relief on that basis alone if the factfinding is dispositive of whether his constitutional rights were violated.  If a mixed question of fact and law is presented, case law is not entirely clear which standard to apply when new facts have been brought into the analysis.  In *Taylor v. Maddox*, the Ninth Circuit determined that whenever a decision on the merits was reached by the state court--regardless of the factual findings--the ultimate constitutional issue should be decided under § 2254(d)(1), whether the state court's decision was contrary to, or an unreasonable application of, Supreme Court precedent. 366 F.3d at 1008.  In *Killian v. Poole*, 282 F.3d 1204 (9th Cir.

2002), the Ninth Circuit suggested that a state court "decision on the merits" made without all of the necessary facts could not really be deemed a "decision on the merits," and therefore the court should review the claims de novo rather than under the deferential standard of § 2254(d).  *Id.* at 1208; *see also Green v. White*, 232 F.3d 671, 676-79 (9th Cir. 2000) (granting relief based on (d)(2) and a de novo legal analysis).

Currently pending before the United States Supreme Court is a case that may address the  the question of the proper standard of law to apply under similar circumstances, *Bell v. Kelly*, 260 Fed.Appx. 599 (4th Cir. 2008), *cert. granted in part by* 128 S.Ct. 2108 (2008).  That case takes up the question of whether a court must apply 28 U.S.C. § 2254(d)'s deferential standard to a claim based on new evidence that was not considered by the state court.  Because the proper standard of law appears unsettled, the Court will analyze the claim under both the deferential standard of §2254(d)(1) and the de novo standard.

## CONCLUSIONS OF LAW

**A.     Due Process Claim**

Petitioner alleges that his continuing incarceration violates due process because the sentencing judge pronounced a maximum sentence of thirty years.  "Upon valid conviction and sentencing of a defendant, due process having been provided, the state may deprive the defendant of his liberty for the term of the sentence pronounced by the district judge."  *State v. Coassolo*, 136 Idaho 138, 143, 30 P.3d 293, 298 (2001), citing *Greenholtz v. Inmates of the Neb. Penal and Corr. Complex*, 442 U.S. 1, 7 (1979) (citations omitted).  The law is clear that when an oral sentence conflicts with the written sentence, the oral sentence controls.  *See Hill v. United States ex rel. Wampler*, 298 U.S. 460 (1936).

The last state court to determine this claim in Petitioner's case was the state district court on appeal from the state magistrate court.  That court determined:

> Cox's next argument is that he possessed a liberty interest in being released after thirty years of incarceration.  According to Cox, the sentencing judge created a liberty interest when he told Cox that an indeterminate life sentence equals thirty years. First, there is a question as to the admissibility of the judge's statements, because of the parol evidence and hearsay rules.  Cox has not provided a transcript of the sentencing hearing, and thus has failed to meet his burden under *Hernandez* and *Brenna[n]*, *supra*.  Further, Cox has provided no authority to support his argument.  Therefore, the decision of the magistrate is affirmed on this issue.

(State's Lodging B-1, pp. 186-87.)

1.      Petitioner's Sentence is Indeterminate Life

Here, the state court made a decision on the merits.  However, the Court concludes that the factfinding process was defective insofar as (1) the state court did not appoint counsel for Petitioner to conduct discovery; (2) did not provide Petitioner with an indigent copy of the sentencing transcript; (3) did not realize that an oral pronouncement governs over a written judgment but thought that such parol evidence would be inadmissible; and (4) did not make any findings of fact regarding the oral sentencing pronouncement to which this Court can defer.  As a result, the Court has not applied the presumption of correctness or clear and convincing evidence standard, but has considered the extrinsic evidence presented at the evidentiary hearing under a preponderance of the evidence standard, and then has considered whether the state court's conclusion was an unreasonable application of federal law.  Having done so, the Court finds and concludes Petitioner has failed to show that his due process rights are being violated by his continuing incarceration on the sentence imposed for his first degree murder conviction.

While the Court has found that Petitioner has sufficiently shown that Judge Felton crossed out the extra words on the judgment prepared by the prosecutor, that finding in itself is not adequate to support Petitioner's argument.  Rather than showing that Petitioner was sentenced "for the maximum indeterminate term of the rest of his natural life," as the prosecutor drafted the judgment language, the official corrected judgment of conviction shows that Petitioner was sentenced "for the maximum indeterminate term of life."

FINDINGS OF FACT, CONCLUSIONS OF LAW, MEMORANDUM DECISION AND ORDER 26

Petitioner has provided no evidence *whatsoever* that any inmate with a life sentence was ever released outright – deemed to have served his full sentence – after serving thirty years.  Petitioner has shown only that legislators, lawyers, prison officials, inmate counselors, inmates, and the Idaho Parole Commission used a figure of thirty years when an *approximation* of a life sentence was necessary for other purposes--such as calculating a date for parole eligibility[1] or trying to determine a fitting punishment for related crimes such as attempt.[2]  These context-specific approximations in no way mean that persons sentenced to an indeterminate life sentence were sentenced to a *maximum* of thirty years. The Idaho appellate courts have clarified that this argument is fallacious and that a life sentence is a life sentence – not a sentence of thirty years.  *See State v. Wilson*, 672 P.2d 237 (Idaho Ct. App. 1983); *State v. Murphy*, 158 P.3d 315, 316 (Idaho Ct. App. 2007) (under Idaho law, a life sentence is not and never has been a thirty-year sentence, nor is there any 'custom and usage' making it so").

At the time Petitioner was sentenced, the punishment for murder was either death or indeterminate life.  There was no provision in the law for a fixed sentence.  It was not possible for the judge to have sentenced Petitioner to a fixed term of thirty years or to a fixed term of life.  Petitioner has not shown by a preponderance of the evidence that the

---

[1] *See King v. State*, 456 P.2d 254 (1969) ("sentences of thirty years or more must be treated for purposes of parole eligibility as effective life sentences.")  *Id*. at 260.

[2] See Petitioner's argument based on a legislative hearing regarding the criminal punishment for "attempt."  (State's Lodging B-1, p. 185, citing Interim Committee on Criminal Code Recodification Minutes, June 22, 1993.)

FINDINGS OF FACT, CONCLUSIONS OF LAW, MEMORANDUM DECISION AND ORDER 27

prosecutor or the court represented to Petitioner that he would be released outright in thirty years, or even that there was a discussion about thirty years either before he pled guilty or at the change-of-plea/sentencing hearing.

Rather, everything indicates – consistent with the only possible sentence permitted by law – that Petitioner was given an indeteminate life sentence, which allowed him an *opportunity* for parole.  While there was some anecdotal evidence indicating that many, or even most, inmates are released on parole within thirty years, nothing in the record indicates that every inmate was necessarily released on parole or that Petitioner had been promised release within any given time period.  Rather, it is clear at that time that the Parole Commission had the authority to make parole decisions within the framework of an indeterminate life sentence.  I.C. § 20-223.

Petitioner has not shown by a preponderance of the evidence that Judge Felton, Mr. Mosman, or Mr. Smith led Petitioner to believe that if he pled guilty, his sentence would be a maximum of thirty years, or that Judge Felton intended or stated that Petitioner would be released on parole or outright after thirty years.  The oral pronouncement reported in the Court minutes and in the "play-by-play" newspaper article shows that Petitioner was sentenced to simply "the maximum indeterminate term of life" or "life imprisonment."  The Court therefore concludes that the oral pronouncement is not in conflict with the written judgment.  As a result of all of the foregoing, the Court concludes that Petitioner's Fourteenth Amendment rights are not being violated by continued incarceration pursuant to an indeterminate life sentence, and relief under §

2254(d)(1) is not warranted given that the state court decision denying relief is not contrary to or an unreasonable application of federal law.

Alternatively, Petitioner's claim fails under a de novo standard of review because Petitioner has not proven the facts underlying his claim by a preponderance of the evidence.  Rather, because the evidence shows that Petitioner was sentenced to an indeterminate life term, not thirty years, his due process rights are not being violated by his continued incarceration.

**B.      Ex Post Facto Claim**

1.      <u>Petitioner's Claim that He Was Not Paroled As Intended by the Judge Fails on the Facts</u>

Petitioner's other remaining claim is that because Judge Felton intended that he be released on parole prior to or at the expiration of thirty years, the Parole Commission's failure to release him is the equivalent of changing his sentence to a fixed sentence in violation of the Ex Post Facto Clause of Article I, § 10 of the Constitution.   In general, an ex post facto violation occurs when a change in a rule or law "retroactively alter[s] the definition of crimes or increase[s] the punishment for criminal acts."  *California Department of Corrections v. Morales*, 514 U.S. 499, 504 (1995). As in *Morales*, ex post facto violation claims can be made in the context of parole.

The last state court to determine this claim in Petitioner's case was the state district court on appeal from the state magistrate court.  That court determined:

In the present case, the state has not increased Appellant's sentence. Appellant's sentence is and always was an indeterminate life sentence.

FINDINGS OF FACT, CONCLUSIONS OF LAW, MEMORANDUM DECISION AND ORDER 29

> There is no legal authority to support the contention that an individual serving an indeterminate life sentence must be released after thirty years. Therefore, Appellant's continued incarceration does not violate the ex post facto clauses of the state and federal constitutions.

State's Lodging B-1, p. 186.)

The state district court made no findings of fact to support this conclusion, other than the implicit finding that Petitioner was sentenced to an indeterminate life sentence. This Court's findings, set forth above, are not to the contrary, and the Court has found that Petitioner has not proven facts to support his claim by a preponderance of the evidence. Judge Felton did not indicate or intend that Petitioner be released outright in thirty years, nor did he indicate or intend that Petitioner necessarily be paroled during his sentence. Rather, Judge Felton pronounced and clarified that Petitioner's sentence was life indeterminate, the only sentence available for first degree murder other than the death penalty. Life indeterminate necessarily included the *possibility* of parole, but, importantly, it did not require a *grant* of parole. Based upon the statutory scheme in place at that time, the decision as to whether an inmate would be paroled was for the Idaho Commission of Pardons and Parole. *See* I.C. § 20-223. The Commission has reviewed Petitioner's case five times for the possibility of parole, and has in its discretion denied parole each time. The Court concludes that this action is consistent with Petitioner's judgment of conviction and thus has not increased his punishment. Therefore, the state court judgment is not contrary to or an unreasonable application of the Ex Post Facto Clause, and his case fails under §2254(d)(1).

FINDINGS OF FACT, CONCLUSIONS OF LAW, MEMORANDUM DECISION AND ORDER 30

Alternatively, based on a de novo review of the record, including all of Petitioner's new evidence, the Court concludes that Petitioner has not brought forward sufficient facts to prove by a preponderance of the evidence that he has a thirty-year sentence or that the judge intended for him to be released on parole within that time, or at all.  Accordingly, because his sentence has not been increased, he has not shown that the Ex Post Facto Clause is being violated by his continuing incarceration on an indeterminate life sentence.

2.   Petitioner's Claim Construed as a Challenge to the Change in Parole Procedures After his Sentence

Petitioner's claim can also be broadly construed as an ex post facto violation that he will not be afforded the opportunity for parole as a result of new parole procedures that have occurred since the date of his conviction and sentence.  (See Petitioner's Second Amended Petition, p. 16 (Docket No. 30)).  Construing the claim in this manner, the Court concludes that it fares no better.[3]

In *California Department of Corrections v. Morales*, 514 U.S. 499 (1995), the United States Supreme Court held that an ex post facto violation occurs in the context of parole when an inmate points to rules or procedures that were adopted *after* the date of an inmate's sentence *and* he demonstrates that such rules or procedures "produce[] a sufficient risk of increasing the measure of punishment attached to the covered crimes."

---

[3]  It appears that this claim is procedurally defaulted because it was raised only as a state law claim in the state habeas matter before the magistrate court and was not appealed at all to the district court.  However, because Petitioner is not entitled to relief on the claim, the Court liberally construes his ex post facto claim to include this claim as a result of his concerns that the Parole Commission has told him that they intend for him to remain in prison for the rest of his life, even though he has an indeterminate life sentence.

*Id*. at 509.  The history of the change in the Idaho parole procedures is as follows.  The Idaho legislature placed authority in the Commission to determine the appropriate interval between an inmate's parole hearings.  *See* Idaho Code § 20-223(c).  When Petitioner was convicted in 1971, the Commission Rule was that a reconsideration hearing must be held no less than every thirty months, beginning thirty months after the original denial of the parole.  *See Izatt v. State*, 661 P.2d 763, 765 n.2 (1983) (setting forth former rule).  In 1987, the Commission amended its Rules to delete the thirty-month requirement.  Instead, inmates are required to submit a Self-Initiated Parole Report (SIPR) if they wished to be reconsidered for parole.  An SIPR can be submitted once per year, and each request has to show a change in circumstances.  *See* IDAPA 50.01.01.500, *et seq*.

Here, Petitioner has not shown that the change from mandatory review hearings to an SIPR system with no mandatory review hearings is significant for ex post facto purposes.  In Idaho, while inmates were considered for parole every thirty months under the old system, they can now be considered every year if the inmate elects to file an SIPR annually.  Although there are no longer mandatory reconsideration hearings, the Commission must consider each SIPR and may schedule a hearing if it deems appropriate.[4]  The eligibility standards for parole remain the same under the old and new system.[5]  There is nothing in the record to show that the Board would exercise its

---

[4]  *See* Rules of the Commission of Pardons and Parole No. 50.01-.02, available on the Idaho Department of Administration website at http://adm.idaho.gov/adminrules/rules/idapa50/0101.pdf.

[5]  *See Quinlan v. Idaho Comm. for Pardons and Parole*, 69 P.3d 146, 152 (Idaho 2003).

FINDINGS OF FACT, CONCLUSIONS OF LAW, MEMORANDUM DECISION AND ORDER 32

discretion differently–and, specifically, in a manner that would create a risk of prolonging Petitioner's incarceration–simply because the system has been changed to SIPRs rather than mandatory review hearings.

The Idaho change is similar to the parole change that was challenged in *Morales*, where the United States Supreme Court held that the California law did not violate the ex post facto prohibition because: (1) the statute applied to a class of prisoners for whom "the likelihood of release on parole [was] quite remote," 514 U.S. at 510; (2) the amendment did not affect the timing of the prisoner's initial parole hearing, only the timing of reconsideration hearings, *id*. at 511, and (3) the parole board retained "the authority to tailor the frequency of subsequent hearings [ ] to the particular circumstances of [an] individual prisoner." *Id*. While the rule applies to all Idaho prisoners, Petitioner is one of the class of prisoners for whom the likelihood of release on parole is fairly remote, because he has a long criminal record and a life sentence. Therefore, the first *Morales* factor favors facial validity when Petitioner's particular status is considered. The other two *Morales* factors weigh in favor of the facial validity of the Idaho statute because they hold true for the Idaho system.

The *Morales* Court placed specific emphasis on the fact that the California amendment affected only those inmates who *had already been found* unsuitable for parole *after a hearing* where due process protections were in place. *Id*. at 510-11. Similarly, in Idaho, inmates are provided with a full initial hearing. They are informed that they can administratively appeal the decision each year by filing an SIPR. Under the new

procedure, the Commission may, in its discretion, schedule a hearing on the SIPR or may deny it without a hearing.

In another similar case, *Garner v. Jones*, 529 U.S. 244 (2000), the ability of an inmate to present a change in circumstances was a key factor leading to the United States Supreme Court's conclusion that the Georgia parole scheme in was facially valid:

> [T]he Board's policies permit "expedited parole reviews in the event of a change in their circumstance or where the Board received new information that would warrant a sooner review." App. 56. These qualifications permit a more careful and accurate exercise of the discretion the Board has had from the outset. Rather than being required to review cases *pro forma*, the Board may set reconsideration dates according to the likelihood that a review will result in meaningful considerations as to whether an inmate is suitable for release.

529 U.S. at 254. Again, Idaho's SIPR procedure specifically directs inmates to present changes in circumstances as the basis for the request for parole. *See* IDAPA 50.01.01.500, *et seq*. Based on the foregoing, the Court concludes that the statute is facially valid against an ex post facto challenge.

Petitioner's "as applied" challenge also fails. In Petitioner's case, the Commission provided Petitioner with an initial hearing and four subsequent hearings; two of the five hearings took place after the 1987 change in the parole rules. After denying parole in January 2000, the Commission informed Petitioner that he could administratively appeal the decision by filing an SIPR. Upon reviewing an SIPR, the Commission decides whether to schedule a hearing.

Petitioner argues that the Commission passed him to his "full term release date" and told him that he is "to stay in prison for the remainder of [his] life." (State's Lodging B-1, p. 37.)  However, this same Commission letter Petitioner relies upon instructs Petitioner to use the SIPR process to appeal his decision if he wishes to do so.  Other hearing testimony from a prison official showed that, in practice and as allowed by the Commission Rules, inmates "passed to their full-term release dates" can and do file SIPRs seeking parole. (Tr. 16:9-17.)  Petitioner is clearly entitled to use the SIPR process each year to request parole.  (See Footnote 5.)   There is no evidence that all inmates deemed "passed to their full-term release dates" are never released on parole at a date in the future through the SIPR process, and Petitioner did not bring forward any evidence that he had submitted any SIPRs.

The Court concludes that Petitioner has failed to show that there is a significant risk of increased punishment simply because the parole system has been changed from mandatory hearings every 30 months to the SIPR system, permitting one request every year.  In summary, the Court concludes that there is no ex post facto violation because of the parole system change or the manner in which it has been administered in Petitioner's particular case.  As a result, the state court's rejection of his ex post facto claim is not contrary to or an unreasonable application of law to the facts of Petitioner's case, and § 2254(d)(1) relief is unavailable to Petitioner.

Neither has Petitioner shown entitlement to relief under a de novo standard because the SIPR system has not significantly increased the likelihood that his

FINDINGS OF FACT, CONCLUSIONS OF LAW, MEMORANDUM DECISION AND ORDER 35

punishment will be increased.  Petitioner has had five parole hearings and is entitled to

submit SIPRs each year to show that his suitability for parole has increased due to

rehabilitation, education, age, or other factors.  Thus, Petitioner is not entitled to relief.

## ORDER

NOW THEREFORE IT IS HEREBY ORDERED denying Petitioner's Petition for

Writ of Habeas Corpus.  Petitioner's Petition is DISMISSED with prejudice.

DATED:  **September 25, 2008**



Honorable B. Lynn Winmill
Chief U. S. District Judge